GIPSON HOFFMAN & PANCIONE
A Professional Corporation
GREGORY A. FAYER (State Bar No. 232303)
GFayer@ghplaw.com
ELLIOT B. GIPSON (State Bar No. 234020)
EGipson@ghplaw.com
1901 Avenue of the Stars, Suite 1100
Los Angeles, California 90067-6002
Telephone: (310) 556-4660
Facsimile: (310) 556-8945

Attorneys for Plaintiff
CYBERsitter, LLC d/b/a Solid Oak Software

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| CYBERsitter, LLC, a California limited liability company, d/b/a Solid Oak Software, <br><br> Plaintiff, <br><br> v. <br><br> The People's Republic of China, a foreign state; Zhengzhou Jinhui Computer System Engineering Ltd., a Chinese corporation; Beijing Dazheng Human Language Technology Academy Ltd., a Chinese corporation; Sony Corporation, a Japanese corporation; Lenovo Group Limited, a Chinese corporation; Toshiba Corporation, a Japanese corporation; ACER Incorporated, a Taiwanese corporation; ASUSTeK Computer Inc., a Taiwanese corporation; BenQ Corporation, a Taiwanese corporation; Haier Group Corporation, a Chinese corporation; DOES 1-10, inclusive, <br><br> Defendants. | CASE NO. CV 10-00038 JST (SH) <br><br> **DECLARATION OF DONALD C. CLARKE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION OF DEFENDANT SONY CORPORATION TO DISMISS THE ACTION ON GROUNDS OF *FORUM NON CONVENIENS* AND RELATED JOINDERS** <br><br> Judge: Hon. Josephine Staton Tucker <br> Ctrm:  10A <br><br> Hearing Date:       Nov. 8, 2010 <br> Hearing Time:       10:00 a.m. <br><br> Discovery Cutoff:     None Set <br> Pretrial Conference:  None Set <br> Trial Date:              None Set |

DECLARATION OF DONALD C. CLARKE

04444\00001\178991.1

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

## DECLARATION OF DONALD C. CLARKE

I, Donald C. Clarke, declare as follows:

1.     I, Donald C. Clarke, submit the following declaration in support of the opposition of plaintiff CYBERsitter, LLC d/b/a Solid Oak Software ("Plaintiff") to the motion of defendant Sony Corporation ("Sony") to dismiss the action on grounds of *forum non conveniens* ("Motion") and to the joinders of ACER Incorporated ("Acer"), ASUSTeK Computer Inc. ("Asus") and BenQ Corporation ("BenQ") (collectively, "Defendants").

## My Background and Qualifications

2.     I am a professor of law at the George Washington University Law School ("GWULS"), where I have been employed since 2005.  My academic specialization is the law of the People's Republic of China in general and the legal regime of economic reform in particular, and I speak and read Chinese fluently.

3.     From 1988 through 2004, I was on the faculty of the University of Washington School of Law ("UWLS"), and have been a visiting professor at New York University Law School and University of California at Los Angeles School of Law.  From 1995 to 1998, I was on a leave of absence from the UWLS and worked as an attorney at Paul, Weiss, Rifkind, Wharton & Garrison ("Paul, Weiss"), a large United States law firm with a substantial China business practice.  During that period, I visited China and Hong Kong approximately twice a year in the course of my work, a substantial amount of which was related to China.  From 1998 through 2003, I regularly worked with Paul, Weiss as a consultant on Chinese law matters.  Since that time I have maintained an independent consulting practice.

4.     I have published widely in the field of Chinese law; a list of publications is set forth in my curriculum vitae, attached hereto as Exhibit 1.

5.     I graduated *cum laude* from Harvard Law School in 1987, where my studies focused on East Asian legal systems and I served as an editor of the *Harvard Law Review*.  I earned a graduate degree (M.Sc. with Honors) in the Government and

1

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1  Politics of China from the School of Oriental and African Studies at the University of
2  London in 1983.  I also studied Chinese history for two years at Beijing University
3  and Nanjing University in China from 1977 to 1977.  I earned my undergraduate
4  degree from Princeton University in 1977.

5      6.    I have served as adviser or consultant on Chinese law matters to a
6  number of bodies, including the Asian Development Bank, the Agency for
7  International Development, and the World Bank's Financial Sector Reform and
8  Strengthening Initiative.  I have testified on aspects of the Chinese legal system before
9  the Congressional-Executive Commission on China and the United States-China
10  Economic and Security Review Commission.  I have been appointed to the Academic
11  Advisory Group to the US-China Working Group of the United States Congress.  I am
12  admitted to practice in the state of New York (1988) and am a member of the Council
13  on Foreign Relations.

14      7.    A full copy of my curriculum vitae is attached hereto as Exhibit 1.

15      **Analysis of Chinese Law and the Present Case**

16  *Nature of and Basis for This Declaration*

17      8.    I have been asked by counsel for the plaintiff in the above-captioned
18  action to provide my professional opinion as to whether China is an adequate forum
19  for hearing the claims of Plaintiff.

20      9.    My opinion herein is based upon my academic and professional legal
21  studies, research, teaching and publishing over the course of many years as a professor
22  of law, my personal experience and familiarity with the Chinese legal system and
23  courts, and the statutes, case law and authorities cited herein.

24      10.    In preparing this declaration I have examined, among other documents,
25  the declaration of Jacques deLisle dated September 10, 2010 (the "deLisle
26  Declaration"), submitted by Defendants.

27
28

2

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

*Summary of Conclusions*

11.    China does not provide an adequate forum for Plaintiff.  When the government of China wishes to control the outcome of a judicial proceeding, it may easily do so.  This is both because the institutional channels exist for political interference, and because in a politically sensitive case judges would accept such political interference as appropriate.  This case would be considered politically sensitive because of the nature of the allegations and the nature of the Defendants.  It is inconceivable to me that the case could be heard purely on its merits in a Chinese court.  Successful political interference is virtually certain.  For this and other reasons set forth below, I believe Plaintiff would not receive meaningful due process in a Chinese court and that it would be unfair to require it to press its suit there.

12.    In particular, I believe, and shall show in this declaration, the following:

13.    Meaningful judicial independence does not exist in China; political authorities are capable of interfering in any lawsuit in which they may take an interest.[1]

14.    This interest, and thus political interference to Plaintiff's detriment, is virtually certain to exist in the current case.  A key defendant is the People's Republic of China—not some local government, but the central government itself.  It is accused of knowingly stealing Plaintiff's intellectual property.  This allegation would be considered extremely sensitive by the political authorities and virtually guarantee political interference in the case.

---

[1]  My standard for independence is not whether interference occurs in all cases; it is whether the channels for effective interference exist when appropriately powerful officials wish to interfere.  It is the *capability* that is key, and it directs us to the important question, which is whether appropriately powerful officials are likely to wish to interfere in a given case.

3

DECLARATION OF DONALD C. CLARKE

15.     If this case were tried in China, it would be difficult for Plaintiff to find counsel, as any attorney or firm taking the case could well be subject to harassment and persecution because of its highly political nature.

16.     Even if Plaintiff could find counsel, such counsel would probably be required to report to political authorities and to accept direction from them in their handling of the case.

*General Observations About the Chinese Legal System*

17.     The remedies and procedures of courts in the United States are the result of centuries of American, English, and European history.  It would be surprising if China, with a completely different history, had managed to produce a similar legal system.  It has not.  Indeed, some scholars argue that it is seriously misleading even to use the vocabulary and concepts of Western law to describe the Chinese institutions for dispute resolution and the maintenance of social order.[2]

18.     The formal institutions of the current Chinese legal system date from after the establishment of the People's Republic of China in 1949.

19.     The legal institutions that were built after 1949 were effectively destroyed during the Cultural Revolution in the mid-1960s.  Most courts ceased to function, persons with legal training were denounced and purged, and law faculties were closed.  Legal education did not begin again until the late seventies and early eighties.  These facts are attested to by numerous sources, both Western and Chinese, and are not in serious dispute.[3]

---

[2]  *See, e.g.,* THOMAS B. STEPHENS, ORDER AND DISCIPLINE IN CHINA 3 (1992) (traditional China); Jerome A. Cohen, *The Chinese Communist Party and "Judicial Independence": 1949-1959*, 82 HARV. L. REV. 967, 1003 (1969) (post-1949 China).

[3]  Wu Jianfan presents the Chinese government's line in labeling the Cultural Revolution period a "disaster" for the legal system.  *See* Wu Jianfan, *Building New China's Legal System*, in CHINA'S LEGAL DEVELOPMENT 1, 13 (John R. Oldham ed., 1986).  *See also* Edward J. Epstein, *Law and Legitimation in Post-Mao China*, in DOMESTIC LAW REFORMS IN POST-MAO CHINA 19, 33 (Pitman B. Potter ed., 1994).

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

20.    Just thirty years have passed since the late 1970s, when the government began rebuilding the legal system.  Whatever results may have been obtained in that time, they are not what it took centuries of slow evolution to produce in the West.  In 2010, to speak of the "rule of law" in China as it is understood in the United States and many other parts of the world is simply wishful thinking.  Consider, for example, the view of Professor Randall Peerenboom, who has in more than one case[4] submitted expert testimony *in support of* a motion for dismissal to China on *forum non conveniens* grounds, and yet has written:

> Rule of law requires a judiciary that is technically competent, independent, and enjoys sufficient powers to resolve disputes fairly and impartially. China's judiciary falls short on each of these dimensions.[5]

Prof. Peerenboom also speaks of a "legislative system in disarray; a weak judiciary; poorly trained judges and lawyers; [and] rampant corruption[.]"[6]  This is far short of the "robust and sophisticated" legal system claimed by Defendants (but not, I note, by their expert Prof. deLisle[7]) to exist.[8]

---

[4]   To the best of my knowledge, most recently in Zhang Guimei v. General Electric, 172 Cal. App. 4th 689 (2009).

[5]   Randall Peerenboom, *What's a Liberal to Do? The Pursuit of Non-Liberal Rule of Law in China*, Statement to the Congressional-Executive Committee on China Roundtable, April 1, 2003, at 22, *available at* http://www.cecc.gov/pages/roundtables/040103/peerenboom.pdf.   I know of no changes since the date of Professor Peerenboom's statement that would make it inaccurate today.

[6]   *See id.* at 10.

[7]   The deLisle Declaration states (p. 13, heading E) that the PRC "has made extensive commitments to providing a robust and comprehensive court system[.]"  This is obviously quite a different matter from asserting that such a court system at present actually exists.

[8]   Defendants' Memorandum of Points and Authorities, dated Sept. 13, 2010 (hereinafter "Defendants' Memorandum").

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

5

DECLARATION OF DONALD C. CLARKE

21.    The problems of the Chinese legal system are well known both inside and outside of China.  The Congressional-Executive Commission on China stated in its 2003 report that

> the poor quality of the judiciary, pervasive corruption, and other problems have led to loss of confidence in the legal system and strong criticism of the courts by the [National People's Congress], the media, and the public.[9]

22.    While China has many institutions facially similar to Western ones—statutes, courts, judges, lawyers—as will be discussed in detail below, they function very differently from their supposed counterparts in other countries, in some cases amounting to no more than a facade.[10]  Sometimes this difference of function is intended and sometimes not.  The end result, however, is a system very different from, and in many cases far less fair than, the court system of the United States.

23.    The deLisle Declaration attaches great importance to China's ranking on the World Bank's "Rule of Law" index.  I do not believe it is appropriate to attach any weight to this ranking in the current proceedings for two reasons.

24.    First, the statement in the deLisle Declaration (para. 45) that this index is "prominent and widely cited" obscures the fact that there is considerable scholarly controversy over its ability to measure anything useful.[11]  This Court should not assume that there is consensus in the scholarly community on the value of this index.

---

[9]    CONGRESSIONAL-EXECUTIVE COMMISSION ON CHINA, ANNUAL REPORT 2003, Oct. 2, 2003, at 63, available at *http://www.cecc.gov* [hereinafter CECC ANNUAL REPORT 2003].

[10]    *See, e.g.,* William C. Jones, *The Constitution of the People's Republic of China*, 63 WASH. U. L.Q. 707, 710 (1985) ("The constitution seems to bear no relation to the actual government of China").

[11]    *See, e.g.*, Kevin Davis, *What Can the Rule of Law Variable Tell Us About Rule of Law Reforms*, 26 MICH. J. INT'L L. 141 (2004).

DECLARATION OF DONALD C. CLARKE

04444\00001\178991.1

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

25.     Second, and more important, even if the Rule of Law index did accurately measure something useful, what it measures cannot by uncritically applied to the issues at stake in a *forum non conveniens* motion.   The Rule of Law index aggregates scores on a variety of sub-indices: it "captur[es] perceptions of the extent to which agents have confidence in and abide by the rules of society, and in particular the quality of contract enforcement, property rights, the police, and the courts, as well as the likelihood of crime and violence."[12]  Thus, a low score on contract enforcement (with which a court hearing a *forum non conveniens* motion would be concerned) could be completely offset by high scores in areas such as police behavior and the likelihood of crime and violence (areas not immediately relevant to the issues involved in *forum non conveniens*).

26.     Thus, a country's ranking either by itself or in comparison with other countries simply does not yield reliable information relevant to a *forum non conveniens* motion.

*Law on the Books Versus Reality*

27.     The argument of the Defendants' Memorandum that China is an adequate forum relies heavily on the deLisle Declaration.  In many places this declaration cites the formal written law of China as authority for its assertions as to how the Chinese legal system operates.   The formal law, however, is not necessarily an accurate description of the way the Chinese legal system actually functions.   It does not necessarily describe what will actually happen if Plaintiff is required to try its claims in China.

---

[12]  Daniel Kaufmann, Aart Kraay & Massimo Mastruzzi, *The Worldwide Governance Indicators: Methodology and Analytical Issues* (World Bank Policy Research   Working   Paper   No.   5430,   Sept.   2010),   *available   at* http://ssrn.com/abstract=1682130.   This paper is an official explanation of the methodology behind the Rule of Law index.

7

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

28.    The gap between law on the books and the legal system as it actually functions in China is wide and well known.  In the words of the late Prof. William Jones of the Washington University Law School, a leading scholar in the field of Chinese law:

> The easiest way for a Western jurist to treat Chinese law is to regard it as being the same as a European system, and thus to analyze the normal legal materials—statutes, regulations, treatises, and cases, if any—in the way they are analyzed in Europe, where it is reasonable to assume that parties adjust their behavior in the light of the law, and where intervention by courts that interpret and enforce the law is a realistic possibility.  *None of this is true for China*.[13]

29.    Other qualified scholars in the field share this view.  Professor William Alford of Harvard Law School has written:  "[T]oo many of China's new laws bear faint relation to life as lived or, indeed, even contemplated by the vast majority of China's populace[.]"[14]  Professor Jerome Cohen of New York University Law School has written, "[T]he gap between the PRC's legislative prescriptions and its judicial reality remains a chasm."[15]

30.    More recently, Prof. Randall Peerenboom has remarked:

> Although China has passed a number of laws over the last twenty years,

---

[13]   William Jones, *Sources of Chinese Obligation Law*, 52 LAW & CONTEMP. PROB., No. 3, at 69, 91 (1989) (emphasis added).  *See also* William P. Alford, *"Seek Truth From Facts" —Especially When They Are Unpleasant:  America's Understanding of China's Efforts at Law Reform*, 8 PACIFIC BASIN L.J. 177, 186 (1990) (criticizing Chinese and Western commentators alike for being "far too concerned with the letter of Chinese law").  Both of these sources are about sixteen years old.  I do not think the Chinese legal system has changed so fundamentally in only sixteen years as to render their views out of date.

[14]   Alford, *supra* note 13, at 183.

[15]   Jerome A. Cohen, *Reforming China's Civil Procedure: Judging the Courts*, 45 AM. J. COMP. L. 793, 794 (1997).

DECLARATION OF DONALD C. CLARKE

there remains a wide gap between the laws on the books and actual practice.  To be sure, there is always a gap in every system. But the distance is wider in China than elsewhere.[16]

31.   Consequently, while the extensive references to the formal law in the deLisle Declaration may be accurate as descriptions of the formal law, they are often inaccurate as descriptions of the actual functioning of the Chinese legal system. Assertions about the functioning of the Chinese legal system can never stop simply with observations about what the formal law says.  Consideration must also be given to actual practice.  I discuss problems with the law and practice of evidence-gathering below.[17]

*Pervasive Secrecy and Lack of Information*

32.   The Chinese government has traditionally treated the legal system as a device for the maintenance of social order, not for the protection of rights.  As a result, the operation of China's legal system and legislative process are in principle state secrets, with details released only on a need-to-know basis.

33.   This principle is manifested in a number of ways.  Trials are still not universally open in the sense that any member of the public may simply walk in and listen as a matter of right.  Permission from the court is required and is by no means always given, especially to foreigners, even in cases where there are no plausible issues of state secrets or personal privacy.  I believe there can be no assurance that a trial of this matter in China would be public in the sense in which the word is usually understood (that is, that members of the public and the press could freely attend as of right, subject only to the limitations of courtroom space applied in good faith).

34.   The court system's continued reluctance to submit itself to uncontrolled public scrutiny underscores in another way my contention that merely citing a rule of

---

[16] Randall Peerenboom, *Seek Truth From Facts: An Empirical Study of Enforcement of Arbitral Awards in the PRC*, 49 Am. J. Comp. L. 249, 308 (2001).

[17] *See* paras. 91-103.

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

9

DECLARATION OF DONALD C. CLARKE

law is not enough to show what actually happens.  Article 120 of the Civil Procedure Law calls for "open" trials, and has done so since its promulgation in 1991.  Yet open trials did not occur.  The Court Organization Law has called for open trials since it was promulgated in 1979, and yet open trials did not occur.  In March 2003, *almost a quarter of a century* after the passage of the Court Organization Law, the Supreme People's Court announced that the open trial system was being "successfully implemented."[18]   It could not be clearer that a citation to a provision of formal law is simply not sufficient to show that a practice or right actually exists in the Chinese legal system.

*Problems with Judicial Independence and Political Interference*

35.    The deLisle Declaration (heading, Part IV.A) states that "the adjudication process under PRC law parallels that of other civil law jurisdictions".  The word "parallels" might mean many things.  If it implies that the process is more or less the same in substance, I strongly disagree.  Adjudication in the PRC is subject to powerful extra-judicial influences, some proper under PRC law and some not.  These influences have no parallel in other major civil law jurisdictions.

36.    Meaningful judicial independence has never existed in the People's Republic of China[19] and does not exist now. This is a matter of common knowledge and is admitted even in the government-controlled media in China.[20]  The Defendants'

_____

[18]   Xiao Yang [President of the Supreme People's Court], *Report on the Work of the Supreme People's Court* (in Chinese), delivered to the National People's Congress, *reprinted in* RENMIN FAYUAN BAO (People's Court News), March 22, 2003, *available at* www.chinacourt.org.

[19]   *See generally* Cohen, supra note 2.

[20]   *See, e.g.,* Ou Chaorong, *A Discussion of the Reform of China's Judge System* (in Chinese), ZHENG-FA XUEKAN (Journal of Political Science and Law), No. 4, 2005, at 68, 68 ("The majority of people admit that China has not yet realized judicial independence"); *see also* Yang Haikun, *A Call for "Judicial Independence"* (in Chinese), FAZHI RIBAO (Legal System Daily), May 23, 1994, at 1 ("The courts have become executive organs of the government"); William P. Alford, *"Seek Truth From Facts" —Especially When They Are Unpleasant:   America's Understanding of*

10

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

DECLARATION OF DONALD C. CLARKE

Memorandum states that "[i]t is well established, and beyond reasonable dispute that China possesses "a functioning and independent judiciary".[21]  Quite the contrary is true.  As shown in the citations in footnote 20, it is common even in China's censored and official media to state that the judiciary is not independent.  I do not know of any Western experts in the Chinese legal system who would describe China's judiciary as "independent" in the usual sense of the word.  Not even Defendants' expert, Prof. deLisle, is willing to do so in his declaration.

37.    First, the decision of the judges who have heard a case can be overridden by more senior court officials who have not.  Courts at all levels have as part of their structure an Adjudication Committee headed by the president of the court.  It is the highest decision-making body within the court as an institution.  The Adjudication Committee has the power, among other things, to make the final decision on the substantive resolution of cases, even if this overrides the decision of the judges who actually heard the case and conducted the trial.[22]  (In keeping with the secrecy attached to the actual functioning of courts, the judgment is still to be signed by the judges who conducted the trial as if they had decided it themselves.)[23]

---

*China's Efforts at Law Reform*, 8 PACIFIC BASIN L.J. 177, 183-84 (1990) ("China's judiciary remains inextricably linked with and subservient to the [Communist] Party").  Note that China's *Legal System Daily* is an official journal that rarely presents anything but a rosy picture of the Chinese legal system.

[21]  Defendants' Memorandum at 12.

[22]  *See, e.g.,* Zhao Hongxing & Guo Linghua, *Abolishing the Adjudication Committee—A Necessary Requirement for "Justice and Efficiency"* (in Chinese), HEBEI FAXUE (Hebei Law Science), No. 6, 2004, at 131, 131 (stating that adjudication committees view civil cases as important and greatly overstep the bounds of their lawful scope of authority).

[23]  *See* Reply of the Supreme People's Court on the Question of How to Sign Verdicts in Cases Discussed by the Adjudication Committee (in Chinese), July 23, 1957, *in* ZHONGHUA RENMIN GONGHEGUO FALÜ QUANSHU (Complete Book Of The Laws Of The People's Republic Of China) 286 (1989).  The reprinting of this document in 1989 in a quasi-official source indicates its contemporary validity.  That

11

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

38.    The Adjudication Committee is supposed to limit its review to cases that are sensitive, complex, or otherwise difficult.[24]  However, reports in the legal press indicate that in many courts it is routine for the Adjudication Committee to decide cases, with the result that "those who try the case do not decide it, and those who decide the case do not try it" (*shenzhe bu pan, panzhe bu shen*).[25]  This is more than a minor procedural difference; it represents a fundamentally different conception of due process, and has been the subject of considerable criticism—albeit so far ineffective—even within China.[26]  The deLisle Declaration's reference to the Adjudication Committee (para. 38) fails to reflect the many objections that have been raised within China itself to this institution.

---

the practice still continues is confirmed in Wang Sumin, *A Discussion of the Perfection of China's Adjudication Committee System* (in Chinese), HAERBIN SHIFAN XUEYUAN XUEBAO (Journal of Harbin Teachers' College), No. 2, 2006, at 66, 66.

[24]  *See* CECC ANNUAL REPORT 2003, *supra* note 9, at 65; TAN SHIGUI, SIFA FUBAI FANGZHI LUN (On The Prevention Of Judicial Corruption) 53 (2003).

[25]  *See, e.g.,* Zhao & Guo, supra note 22, at 131; Tang Jieying, *On Institutional Guarantees for Judicial Independence in China* (in Chinese), HUADONG ZHENG-FA XUEYUAN XUEBAO (Bulletin Of The East China Institute Of Politics & Law), No. 6, 2000, at 51, 53; Sun Jiebing, *Obstacles and Solutions to the Implementation of Independent Adjudication by Courts Today* (in Chinese), XIANDAI FAXUE (Modern Jurisprudence), No. 1, 1989, at 44, 45.  The phrase is so common that it would be otiose to cite multiple sources.  Many more could be found.  One author, in a study of nine local courts in a large provincial city, found that all criminal cases had to be passed on by the Adjudication Committee; all other cases had to be approved by the head of the relevant chamber (*i.e.*, the section of the court in charge of a particular class of case, such as civil or administrative cases).  Where the presiding judge (who actually handles the case, sees the evidence, and hears the presentations of counsel for each side) and the head of the chamber disagreed, the case would go to the Adjudication Committee for resolution.  *See* Li Xiaobin, *How Can Adjudication Efficiency Be Greatly Raised?* (in Chinese), FAXUE (Jurisprudence), No. 10, 1998, at 52, 53.

[26]  *See, e.g.,* Zhao & Guo, *supra* note 22, at 132; Tang Jieying, *supra* note 25, at 53; Li Shaoping, *Change "Decision Before Trial" to "Trial Before Decision"* (in Chinese), FAXUE YANJIU (Legal Studies), No. 2, 1990, at 39.

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

12

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

39.     Prof. Zhu Suli, the Dean of the Faculty of Law of Beijing University, takes a more sympathetic view of the Adjudication Committee, but nevertheless states that its proceedings and decisions can be dominated by those who are not specialized in law, and that it tends to have more cases than it can handle competently: judges in charge of trying cases tend to pass them whenever possible to the Adjudication Committee as a way of avoiding responsibility for difficult decisions.[27]

40.     It is inconceivable to me that this case, if accepted for hearing by a Chinese court, would not be referred to the Adjudication Committee for a decision. The judges who actually conducted the proceedings would not have the last word.

41.     Second, the Chinese courts are vulnerable to outside pressures, in particular through the Political-Legal Committee of the local Communist Party organization.  The local Party tends to judicial matters through its Political-Legal Committee (*zheng-fa weiyuanhui*),[28] which has traditionally been in charge of the police, the procuratorate,[29] and the courts.  The Political-Legal Committee is often

---

[27]   *See* SU LI, SONG FA XIA XIANG (Sending Law to the Countryside) 127 (2000).  The point regarding case overload is echoed by Yan Hao, *The Alienation and Reconstruction of the Function of the Adjudication Committee* (in Chinese), XINAN ZHENG-FA DAXUE XUEBAO (Journal of the Southwest University of Political Science and Law), No. 6, 2005, at 95, 95.

[28]   According to the Notice of the Central Committee of the Chinese Communist Party on the Establishment of Political-Legal Committees (Central Committee Doc. No. 5, 1980), a Political-Legal Committee, *inter alia*, "guides the work of the various political-legal departments" (this would include courts) and "properly disposes of important and difficult cases."  This document, still secret to the best of my knowledge, is cited in the Chinese Communist Party Central Committee Notice on Strengthening Political-Legal Work (in Chinese), Jan. 13, 1982, *reprinted in* ZHONGGONG NIANBAO 1983-84 (Yearbook Of Chinese Communism 1983-84) 8-3, 8-6 (Taipei 1984).

[29]   The procuratorate (also known as the procuracy) undertakes most prosecutions on behalf of the state, in addition to other duties.

DECLARATION OF DONALD C. CLARKE

04444\00001\178991.1

headed by the leader of the local police or by someone ranking just below the leader of the local Party and government.[30]

42.   For many years, it has been the practice in China for local Party secretaries or Party committees to review and approve the disposition by courts of cases they deem important.[31]

[Although the Political-Legal Committee] is in name an organ of coordination among the police, procuratorate, and courts, it is in reality the organ of leadership for all three. It involves itself directly in

---

[30] *See* Xu Xianming, *On the Current State of Judicial Independence in China and Proposals for Its Reform* (in Chinese), SHANXI GAODENG XUEXIAO SHEHUI KEXUE XUEBAO (Social Sciences Journal of Shanxi Higher Educational Institutions), No. 4, 2002, at 51, 51.  In the words of one article in the Chinese legal press:

There now exists universally, throughout the country, a situation whereby the [local] political-legal committees exercise unified leadership over the public security bureau, the procuratorate, and the courts—and whereby the chief of the public security bureau holds, concurrently, the post of Secretary of the Political-Legal Committee.

*Some Suggestions Regarding the Structural Reform of Procuratorial Organs* (in Chinese), FAXUE JIKAN (Legal Studies Quarterly), No. 1, 1987, at 70, 71.  While it is probably no longer true that the Political-Legal Committee is *always* headed by the local chief of police, it remains true that the Committee is the locus of the exercise of unified leadership by the local Party organization over the police, the procuratorate, and the courts.  *See* Guo Daohui, *Implementing Judicial Independence and Preventing Judicial Corruption* (in Chinese), FALÜ KEXUE (Law Science), No. 1, 1999, at 5, 8.

[31]   This practice, far from being irregular, has in fact been given a name: "*shuji pi'an*" ("approval of cases by the [local Party] secretary").  *See, e.g.,* Fan Zhongxin, *China's Judicial Tradition and the Hidden Rules in China's Present-Day Judicial System* (in Chinese), Oct. 12, 2005, *available at* http://www.chinalawinfo.com/forum/ltPages.asp?lsID=25&id=71288&ltStyle=1; Zhou Yongkun, *The Law of Society and the Law of the State* (in Chinese), FA SHANG YANJIU (Studies in Law and Commerce), No. 2 (2003), at 109, 113.  A more extensive discussion of the practice is available in Hungdah Chiu, *Structural Changes in the Organization and Operation of China's Criminal Justice System*, 7 REV. SOCIALIST L. 53, 59-61 (1981).

---

14

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

adjudication work, and in some cases decides the verdict itself.[32]

43.     Prof. He Weifang of Beijing University Faculty of Law, considered to be China's top law faculty, wrote in 1995 that "[the court] often reports . . . to the local Party committee and solicits opinions for solution . . . and if contradictions arise among different judicial organs, the Party's political-legal committee often steps forward to coordinate."[33]

44.     This practice has by no means disappeared.   There have been some directives in the last two decades aimed at reducing the direct role of the Political-Legal Committee, and Party secretaries and other powerful non-legal officials may less regularly involve themselves in the disposition of cases in which they do not have a particular interest.   *That they do continue to involve themselves, however, is beyond question.*   The Political-Legal Committee can still dictate the outcome of particular cases.[34]   There have occurred no institutional changes in the way courts operate that would make such a practice impossible, should a Party (or government) official

---

[32]   Sun Jiebing, *supra* note 25, at 44.

[33]   He Weifang, *The Realization of Social Justice Through Judicature: A Look at the Current Situation of Chinese Judges* (in Chinese), in ZOU XIANG QUANLI DE SHIDAI: ZHONGGUO GONGMIN QUANLI FAZHAN YANJIU (Toward a Time of Rights: A Perspective of the Civil Rights Development in China) 209, 249 (Xia Yong ed., 1995). The same point was made more recently in Li Changlin, *Securing Judicial Independence Through Institutional Arrangements* (in Chinese), XINAN ZHENG-FA DAXUE XUEBAO (Journal of the Southwest University of Politics and Law), No. 3, 2005, at 19, 19.

[34]   *See* Xu Zhanfeng, *Institutional Obstacles to the Professionalization of Judges and Countermeasures* (in Chinese), XI'AN ZHENGZHI XUEYUAN XUEBAO (Journal of the Xi'an Institute of Politics), No. 1, 2003, at 55, 55 ("In some places, important cases must be approved by the secretary of the Political-Legal Committee"); Jiang Xianjin & Zheng Jun, *A Legal-Sociological Analysis of the Causes of Local Protectionism in Judicial Adjudication* (in Chinese), LILUN QIANYAN (Theoretical Front), No. 1, 2001, at 14, 14 (Political-Legal Committee "has the right to look into important cases, and can express its view (normally decisive) on how the case should be handled").

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

15

DECLARATION OF DONALD C. CLARKE

1  choose to interest himself or herself in a particular case, and many times officials will

2  so interest themselves.  The threat of extra-judicial interference remains, and it is real

3  and substantial:

> When the court president confronts a difficult, complex, or important case, sometimes even before the case has been discussed by the panel [of judges assigned to hear the case], he will hand it over to the Party group within the court, or the [Party] Political-Legal Committee, or the Party Committee [above the Political-Legal Committee] and government. Subsequently, he will bring the views of Party and government departments and their leaders back to the panel and the Adjudication Committee, and the Adjudication Committee becomes the agency for implementing the views of Party and government departments and their leaders.  This results in direct interference with the court's application of law and adjudication work in specific cases . . . .[35]

45.    Political interference with court decisions remains possible because the institutions that give rise to it remain in place.  Those institutions are (1) Communist Party control over the appointment of judges, and (2) local government (controlled by the local branch of the Party) control over all aspects of a court's activity, from operating expenses to judges' salaries to housing and employment for judges' family members.[36]  *Over two decades of legal reform have not touched these institutions and*

---

[35]   Pan Xing, *Empirical Research on Reform in China's Adjudication Committee* (in Chinese), GANSU KEJI ZONGHENG (Gansu Science and Technology), No. 3, 2005, at 84, 84.

[36]   *See generally* Zhu Wei, *On Judicial Independence* (in Chinese), DANGDAI FAXUE (Modern Jurisprudence), No. 6, 2000, at 5, 6; CECC ANNUAL REPORT 2003, *supra* note 9, at 65; Tan Shigui, *supra* note 24, at 53; and Randall Peerenboom, *What's a Liberal to Do? The Pursuit of Non-Liberal Rule of Law in China*, Statement to the Congressional-Executive Committee on China Roundtable, April 1, 2003, at 12, *available at* http://www.cecc.gov/pages/roundtables/040103/peerenboom.pdf ("[J]udges are currently subject to too much supervision and outside interference.  The

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

16

DECLARATION OF DONALD C. CLARKE

*practices, and they remain in place in large cities such as Shanghai and Beijing as they do everyone else in mainland China.*

46.    The formal power of appointment and dismissal of court personnel is lodged in local legislatures (People's Congresses).  In practice, however, they act as rubber stamps for the local Party organizational department.  The real power is in the hands of the local Party leadership:[37]

> If the court insists on handling things according to law and disposes of certain cases in ways not satisfactory to these leaders, some of them will use their power to arbitrarily reassign the court's leadership.[38]

47.    The judges of any court hold office at the pleasure of the Communist Party organizations at the same administrative level as the court, which are also the bodies that control the government at the same administrative level.

independence of the courts is threatened by the lack of adequate funding, the reliance on governments at the same level for funding and the way judges are appointed.").

[37] *See* Peng Haosheng & Wu Zeyong, *The Specific Institutions of Judicial Independence* (in Chinese), HEILONGJIANG SHENG ZHENG-FA GUANLI GANBU XUEYUAN XUEBAO (Journal of the Heilongjiang Province Political-Legal Administrative Cadre Institute), No. 2, 2006, at 12, 12 (stating that people's congresses simply follow the will of the Party committee in judicial appointments); Yang Yonghua & Chen Xianglong, *The Institutional Guarantor of Judicial Justice and the Independence of Judges* (in Chinese), HEILONGJIANG SHENG ZHENG-FA GUANLI GANBU XUEYUAN XUEBAO (Journal of the Heilongjiang Province Political-Legal Administrative Cadre Institute), No. 4, 2003, at 104, 104 (calling Communist Party's personnel power "extremely harmful" to judicial independence and justice); Yao Li, *An Analysis of the China's Current Judge System and its Institutional Reconstruction* (in Chinese), FAXUE (Jurisprudence), No. 9, 2003, at 21, 21 (labeling as "empty" the appointment power of the local People's Congress); Guo Daohui, *supra* note 30, at 7, 8.

[38] Shi Youyong, *Local Protectionism in Adjudication: Causes and Countermeasures* (in Chinese), FAXUE (Jurisprudence) (Shanghai) No. 6, 1989, at 15, 15.  Little has changed since Shi made this point in 1989.  Prof. Guo Daohui made exactly the same complaint ten years later, *see* Guo Daohui, *supra* note  30, at 8, and it appears again in 2006, *see* Peng & Wu, *supra* note 37, at 13.

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

17

DECLARATION OF DONALD C. CLARKE

04444\00001\178991.1

48.     Court personnel depend upon local government at the same level for their finances as well, including salaries, housing, and other benefits.  This fact is well known to all scholars of the Chinese legal system inside and outside of China and is not in dispute.[39]

49.     The Chinese press frequently carries reports of local governments using their power over courts and other legal institutions to exercise influence on behalf of local interests.  In its most egregious form, such interference takes the form of sending local police to kidnap opposing parties and hold them hostage, with the cooperation of local courts, until they pay the amount demanded by the local plaintiff.[40]

50.     On a more subtle level, political interference consists of instructions to the local court either to refuse to take a case at all, or to render a judgment favorable to the local party.[41]

In  many cases, local Party and government leaders will, at the urging of parties or in order to protect the interests of the locality and to uphold

---

[39]   Any number of sources could be found to support this statement.  *See, e.g.,* CECC ANNUAL REPORT 2003, *supra* note 9, at 65; *see also* Xie Youping & Wan Yi, *Judicial Reform of the Paradox of Judicial Organs Becoming Administrative in Nature and Judicial Independence* (in Chinese), JIANGSU SHEHUI KEXUE (Jiangsu Social Science), No. 1, 2003, at 140, 140; Zhu Wei, *supra* note 36, at 6; Tan Shigui, *supra* note 24, at 53; Guo Daohui, *supra* note 30, at 7, 8.

[40]   *See, e.g.,* David Lague, *More Than They Bargained For: The Nightmare of Detained Hong Kong Traders on the Mainland*, FAR EASTERN ECONOMIC REVIEW, Dec. 13, 2001, *available at* 2001 WL-FEER 24083192; Jonathan Manthorpe, *Sour Business Deals a Risk for Canadians; Hostage-Taking, Arrests Become Major Problem*, OTTAWA CITIZEN, Nov. 25, 1994, at E8 ("Arbitrary arrests and hostage takings by disgruntled Chinese partners—many of them state enterprises and local governments that can use the courts and security services to their own ends—have become an increasing problem[.]").  A prominent recent example is the case of David Ji, a U.S. citizen seized in Shenzhen, Guangdong Province, by police from Mianyang in Sichuan Province, acting apparently at the behest of a powerful Mianyang company seeking funds allegedly owed to it by Ji's company.  *See* Joseph Kahn, *Dispute Leaves U.S. Executive in Chinese Legal Netherworld*, NEW YORK TIMES, Nov. 1, 2005.

[41]   *See, e.g.,* Guo Daohui, *supra* note 30, at 8; Tan Shigui, *supra* note 24, at 53.

18

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

their own image, send notes or make telephone calls to the leaders of judicial organs or the personnel handling a case.  Once a party has this shield or magical sword, it will launch a wanton attack on the leaders of judicial organs or personnel handling the case using sugar-coated bullets, inviting them to meals and sending gifts, even to the point of bribery.  It is from this that a great deal of judicial corruption is generated.[42]

51.     In one case, local government officials, upon hearing that the local court was preparing to accept a case naming an important local enterprise as defendant, reportedly remonstrated:

The Trust and Investment Company is an enterprise under district jurisdiction; a case as big as this will have an effect on the finances of the whole district.  Don't you want your salaries paid?  As for your application to the district to allocate funds for a dormitory, don't be ridiculous!  You court people need to think of some excuse for blocking this case and not accepting it.[43]

52.     In the words of an official 1993 report,

There are occasions when local leaders interfere with adjudication or execution on behalf of local interests by making telephone calls or sending notes [to judges].  Because the courts rely on local government for matters such as finances, housing, and employment for children, their resistance is always very weak.[44]

---

[42] Tan Shigui, *supra* note 24, at 53.

[43] Zhang Yiping, *Thoughts About the Problem of Local Protectionism in Economic Adjudication* (in Chinese), SHENZHEN FAZHI BAO (Shenzhen Legal System News), Nov. 14, 1990, at 3.

[44] *Report on the Situation Regarding Implementation of the "Civil Procedure Law of the People's Republic of China"* (in Chinese), in ZHONGHUA RENMIN GONGHEGUO QUANGUO RENMIN DAIBIAO DAHUI CHANGWU WEIYUANHUI GONGBAO (PRC National People's Congress Standing Committee Gazette), No. 1, 1993, at 90,

19

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

53.     The preceding sources are by no means outdated.  An article published in 2005 in a major law faculty journal describes the same situation today:

> The local Party committee, People's Congress, and government hold power of the personnel, finances, and materials of courts.  In order to obtain the human and material resources necessary for adjudication, when the local Party committee, People's Congress, or government interest themselves in a case, courts have no choice but to make a report and request instructions, and through the sacrifice of judicial independence obtain the support of the relevant departments.[45]

54.     A scholar at the Institute of Law of the Chinese Academy of Social Sciences in Beijing recently published an extensive analysis of local protectionism in the courts, in which he commented that "when confronted with interference, disturbance and influence exerted by various external forces, the judiciary has to surrender itself to the external pressure and cater for the needs of local interests."[46]  A judge in Jinan, the capital of Shandong Province, reported in 2003 that 70% of the cases he handled met interference from local government leaders in the execution of verdicts.[47]

55.     Prof. Guo Daohui reports that it is common for local Party committees to issue instructions to courts telling them how to handle particular cases.  Some areas have a specific rule providing that where a party from outside the jurisdiction sues a local enterprise, the court must get permission from the local Party leadership to hear

---

95 [hereinafter *Implementation Report*].

[45]  Li Changlin, *supra* note 34, at 19.

[46]  Liu Zuoxiang, *Critique of Judicial Local Protectionism in China:  Reflections on 'Nationalization of Judicial Power' as the Guideline for Judicial Reform* (in Chinese), FAXUE YANJIU (Legal Studies), No. 1, 2003, at 83, 90.

[47]  *See Rule by Law Should Be Reinforced*, CHINA DAILY (BUSINESS WEEKLY), Dec. 23, 2003, *available at* http://www.chinadaily.com.cn/en/doc/2003-12/23/content_293544.

20

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

the case, or the court is ordered to judge the case in accordance with the instructions of the Party committee.[48]  For example, a judge in Jinan, the capital of Shandong Province, reported in 2003 that 70% of the cases he handled met interference from local government leaders in the execution of verdicts.[49]

56.    It should be noted that China has no institution like the jury system that could operate as a check on extra-judicial influence being brought to bear on judges. There is a system allowing for the occasional participation of lay assessors in hearing cases, but by all accounts their role is largely or completely ceremonial.  Court officials themselves decide whether assessors shall sit at any given trial as well as who they shall be.

57.    The misgivings I have expressed above about the vulnerability of the Chinese courts to political pressures are widely shared by qualified scholars of the Chinese legal system outside China.  For example, Prof. William Alford of the Harvard Law School has stated, "The judiciary does not enjoy the degree of independence from political authority we associate with the rule of law, and corruption, poor training, and local favoritism plague the judiciary and administrative

---

[48]    *See* Guo Daohui, *supra* note 30, at 8; Wu Yugong, *Judicial Independence and Local Protectionism* (in Chinese), HUNAN GONGAN GAODENG ZHUANKE XUEXIAO XUEBAO (Journal of the Hunan Higher and Specialized Institutes of Public Security), No. 2, 2004, at 19, 19; *see also* Liu Lihui, *The Present Situation of Judicial Independence in China and Its Guarantee* (in Chinese), LANGFANG SHIFAN XUEYUAN XUEBAO (Journal of Langfang Teachers College), No. 2, 2003, at 104, 104:

> Some areas even stipulate that courts may accept cases only with the permission of the Party Committee or the Political-Legal Committee.  When a case is being adjudicated, the Party Committee can review the case files, the Party secretary can give instructions about the case, and the Political-Legal Committee can coordinate, or discuss and decide on, concrete issues relating to the case.  This seriously harms judicial independence.

[49]    *See Rule by Law Should Be Reinforced*, *supra* note 47.

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

21

DECLARATION OF DONALD C. CLARKE

agencies."[50]  Prof. James Feinerman of the Georgetown University Law Center has stated that China's courts are "notoriously subject to political pressures."[51]   Prof. Peerenboom in his book on the modern Chinese legal system has stated:

> Local protectionism may take many forms, some more serious than others. Local government officials may put pressure on a court to decide a case in favor of the local party, deny an outsider's application for enforcement, or just drag out the enforcement process, usually by requesting additional documents or leaving a case pending.   Local protectionism is therefore a matter of degree; it may impede, or be an absolute bar to, recovery.[52]

58.    More recently, writing on arbitration, he has stated:

> [J]udges are more likely to be subject to outside pressures than independent arbitrators are and less able to resist the pressure, particularly when it comes from Chinese Communist Party organs, the local government, or superiors in the court system.[53]

59.    Even the President of China's Supreme People's Court makes no effort to hide the existence of these problems:

> Courts have often been taken as branches of the government, and judges viewed as civil servants who have to follow orders from superiors, which

---

[50]   Statement of William P. Alford, Henry L. Stimson Professor and Director of East Asian Legal Studies, Harvard Law School, February 7, 2002, *available at* http://www.cecc.gov/pages/hearings/020702/alford.php.

[51]   James V. Feinerman, *The Rule of Law Imposed from Outside: China's Foreign-Oriented Legal Regime Since 1978*, in THE LIMITS OF THE RULE OF LAW IN CHINA 304, 316 (Karen G. Turner, James V. Feinerman, and R. Kent Guy eds., 2000).

[52]   RANDALL PEERENBOOM, CHINA'S LONG MARCH TOWARD RULE OF LAW 311 (2002).

[53]   Randall Peerenboom and Kathleen Scanlon, *An Untapped Dispute Resolution Option*, 32 CHINA BUSINESS REVIEW, No. 4 (July 2005), at 36.

DECLARATION OF DONALD C. CLARKE

04444\00001\178991.1

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

prevents them from exercising mandated legal duties like other members of the judiciary.[54]

60.     In Paragraphs 47-57 of his declaration, Prof. deLisle speaks highly of the competence and professionalism of Beijing and Shanghai courts and judges. Assuming for the sake of argument that such judges are indeed the best educated and most competent in the country, education and competence are no bulwark against the mechanisms for political interference with court work that I have described above. The institutional features of the Chinese political and legal system that compromise judicial independence in courts across the country are present in Beijing and Shanghai just as they are present in rural and small-town courts staffed by retired army officers with little or no legal education.

61.     Furthermore, the fact that the courts that would hear this case are not the basic-level courts, where the problems are generally the worst, offers no assurance that local political influence would not be used.  As Prof. Peerenboom has written,

> Even provincial-level courts are not immune from protectionism sentiments. HPCs [Higher People's Courts] are still likely to have a greater interest in local companies where the HPC is located and more generally in companies within their own province.[55]

62.     It is important to note that we are not confined to guesswork and speculation about how Chinese courts might treat litigation by foreigners against a locally powerful defendant.  In 1993, Revpower Limited, the Hong Kong subsidiary of a U.S. company, attempted to enforce, through one of Shanghai's Intermediate-Level People's Courts, an arbitration award against Shanghai Far East Aero-

---

[54] *China Vows to Overhaul Courts*, BBC News, July 8, 2002, *available at* http://news.bbc.co.uk/1/hi/world/asia-pacific/2115571.stm (reporting speech by Supreme People's Court President Xiao Yang).

[55] Peerenboom, *supra* note 52, at 327.  Note that Shanghai is considered equivalent to a province for administrative purposes.

DECLARATION OF DONALD C. CLARKE

04444\00001\178991.1

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

1    Technology Import & Export Corporation ("SFAIC").[56]  SFAIC was a state-owned

2    enterprise.  According to the Congressional testimony of Revpower's president,

3         When we filed the award with the Shanghai Court, the court refused to

4         give us a receipt for the award, or a case number, and for the next two

5         years refused to even acknowledge that the award existed.

6    In other words, the court did not even challenge the validity of the award; it simply

7    stonewalled.

8         63.    A more recent relevant case is Zhang Guimei v. General Electric.[57]  In

9    that case, the trial court agreed with defendants that plaintiffs should first attempt to

10   get relief in Chinese courts against a locally powerful defendant, China Eastern

11   Airlines.  (It is important to note here that contrary to what is asserted in the deLisle

12   Declaration (para. 48), the trial court in California *did not dismiss the action* as

13   requested by defendants.  It was sufficiently concerned by the problems in the Chinese

14   judicial system that it *stayed* the action, retaining jurisdiction in case various

15   assurances did not come to pass.  The California court has in fact remained involved

16   in the progress of the case.)

17        64.    Despite assurances by the defendants and their expert that plaintiffs could

18   get a fair hearing of their claims in China, the plaintiffs have run into obstacle after

19   obstacle.[58]  Plaintiffs attempted on two occasions to file their case in court in Beijing.

20        [56]   The facts and the quotation supplied in this paragraph are from Prepared

21   Statement of Robert R. Aronson, Chairman, Ross Manufacturing Corporation and

22   RevPower Limited, Fort Lauderdale, Florida, Before the House Comm. on Ways and

23   Means, Subcomm. on Trade, Federal News Service, Nov.4, 1997, available in LEXIS,
     NEWS Library, Federal News Service File.

24        [57]   172 Cal.App.4th 689, 91 Cal.Rptr.3d 178 (2009).

25        [58]   The following paragraphs describing the history of this case in China are

26   based on Chinese press reports: *"Baotou kongnan an" susong shimo* (The Story of the

27   "Baotou Air Crash Case" Litigation), NEIMENGGU CHEN BAO (Inner Mongolia Morning Post),   March   27,   2009,   *available   at*

28   http://www.nmgcb.com.cn/Columns/Hot/200919278938179.htm;  *Baotou kongnan suopei an: Gong Hang xiang shouhai jiashu suoqu peichang* (Baotao Air Crash

24

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

The first time was in November, 2007 at the Beijing No. Intermediate Court; court officials, apparently already aware of the case and its sensitivity, refused to accept the case materials.  Contrary to the requirements of China's civil procedure law, the court refused to state a reason and to issue a document formally rejecting the case, making appeal impossible.

65.     In June, 2008 the plaintiffs tried again to file in the Beijing No. 2 Intermediate Court; the court again refused to take the case, and again refused to provide a reason or issue a formal notice of rejection.

66.     In July, 2008 the plaintiffs attempted to file their case in Shanghai.  The Shanghai No. 1 Intermediate Court agreed to look at the case materials, but soon sent them back to the plaintiffs, declining to hear the case.

67.     The plaintiffs then went back to Beijing and tried again. On August 10, 2009, the Beijing No. 2 Intermediate Court finally formally accepted the case for hearing.

68.     According to Article 135 of the Civil Procedure Law of China, "A people's court shall, in handling a case to which ordinary procedure is applied, close it within six months from filing the case. Where an extension of the term is necessary for special circumstances, a six-month extension may be given subject to the approval of the president of the said court. Any further extension shall be reported to the people's court at a higher level for approval." More than one year after the court accepted the case filing, not only has the case not been closed, *an initial hearing has not even been scheduled*.

---

Compensation Case: China Eastern Airlines Seeks Compensation from Victims' Families), NANFANG ZHOUMO (Southern Weekend), Sept. 10, 2009), *available at* http://nf.nfdaily.cn/nanfangdaily/nfzm/200909100121.asp; *Kenqing jinkuai shenli ci an* (Please Try This Case as Soon as Possible), Aug. 9, 2010, *available at* http://news.sina.com.cn/c/2010-08-09/222117937856s.shtml (reprinted from Inner Mongolia Morning Post).

DECLARATION OF DONALD C. CLARKE
04444\00001\178991.1

69.     In short, plaintiffs attempted to sue powerful Chinese defendants in a U.S. court.  Defendants and their expert witness succeeded in getting the case sent to China by providing assurances that the Chinese legal system would provide unbiased, adequate relief.  Yet after three years of trying to have their case docketed and tried, plaintiffs have been unable to get Chinese courts *even to follow Chinese law*.  This goes beyond questions of adequacy of remedy.  This is no remedy at all.

70.     I believe these cases can be explained only by the presence, or threat of, extra-judicial interference.  While two cases do not prove how all Chinese courts handle the general run of cases, they are suggestive of the problems that can occur with important cases involving large judgments against powerful defendants.

71.     *The institutional features of the court system that allowed political interference to occur in the Shanghai Intermediate Court in 1993 are still fully present today.*  Two recent examples of how the Shanghai courts treat sensitive cases—and the range of matters considered sensitive—are a suit against the Nestlé Company for failure to label genetically modified foods and a suit against a highway development company in Shanghai for improper collection of tolls.[59]

72.     In the Nestlé suit, a succession of Shanghai courts refused to accept the case for docketing, arguing that it was not within their jurisdiction.  One Shanghai judge was quoted as explaining the courts' reluctance to take the case as follows: "Everyone is watching this kind of case closely; you can't afford to make the slightest mistake.  The pressure on adjudication is rather large.  Moreover, there will be many people from all over contacting the court, and it's easy to offend people."  The article,

---

[59] *See* Chen Huan, *Lawyers Step up to Public Interest Litigation; Victory Difficult to Achieve* (in Chinese), *available at* http://www.legalinfo.gov.cn/misc/2005-07/21/content_171207.htm (Chinese Ministry of Justice web site).  Subsequent factual statements about these two cases are all sourced in this article unless specifically otherwise indicated.

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

which appears on the official web site of the Ministry of Justice, explains that one of the sources of this pressure on the court is local government.[60]

73.    In the highway toll case, plaintiffs alleged that the defendant had placed its toll collection booth improperly such that it collected tolls from vehicles that did not in fact use the highway with which the tolls were associated.  Although the court accepted the case for docketing on Oct. 20, 2004, it would not schedule a trial date.[61] Finally, on Feb. 1, 2005, the Shanghai municipal government declared that tolls would no longer be collected on the highway in question, making the case moot.  The likely explanation is that the Shanghai government did not want the defendant—very possibly owned at least in part by the Shanghai government—to lose the case, but was not ready to defend it, and therefore instructed the court to hold off until it could come to a decision on a proper resolution of the issue.

74.    The result in this case is unlikely to offend anyone's sense of justice, and the interference is perhaps minor.  The point, however, is that these cases reinforce the conclusion that courts have no meaningful independence; they are essentially an arm of government administration and function as such.   Indeed, what academic commentators label "interference" is no doubt often scarcely perceived as such by those who give it or those who receive it.  It is just part of the normal functioning of the courts.

———————————

[60]  The original suit was filed on June 2, 2003.  In April, 2004, the court which finally accepted the case, the Shanghai No. 2 Intermediate People's Court, found against the plaintiff.  The plaintiff's appeal to the Shanghai Higher People's Court was rejected in late 2004.  *See Consumer Loses Nestlé Genetic Modification Suit* (in Chinese), NANFANG DUSHI BAO (Southern Metropolitan News), Nov. 4, 2004, *available                                                                                                            at* http://www.nanfangdaily.com.cn/southnews/tszk/nfdsb/spzk/200411040770.asp.

[61]    The court's delay was unusual and regarded as such by observers. According to Article 135 of China's Civil Procedure Law, the entire trial procedure for ordinary cases should be completed within six months of the case being docketed.

27

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

75.     That officials outside the court system at various levels of government, both central and local, have the capacity and, at appropriate times, the will to exercise illegitimate interference in court cases does not appear to be in dispute in this case.  A recent paper by Prof. Randall Peerenboom is devoted to the question of when interference can be considered legitimate and when it cannot, as well as to an analysis of the types of cases in which such illegitimate interference is most likely to occur.[62]

76.     Professor Peerenboom does not dispute that effective interference occurs in at least some cases:

> In general, Party and government influence determines, either directly or indirectly, the results of political cases.[63]

> Not every political case gives rise to direct interference, though some form of intervention is likely in most such cases.  These cases are generally decided through political channels or at least with heavy input from political entities.  Party organs play a large and generally decisive role in determining the content of laws, in issuing policy statements or in some cases intervening in specific cases.  There is a trial but the results are easily predicted in advance.[64]

> [N]ot every political or politically sensitive case results in direct interferences.  On the other hand, routine cases are not necessarily free from interference.[65]

---

[62] Fu Yulin and Randall Peerenboom, *A New Analytic Framework for Understanding and Promoting Judicial Independence in China* (2009), *available at* http://ssrn.com/abstract=1336069.

[63] Fu and Peerenboom, *supra* note 62, at 7.  "Political cases" is a defined term in the paper.

[64] Fu and Peerenboom, *supra* note 62, at 10.

[65] Fu and Peerenboom, *supra* note 62, at 2.

28

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

77.    Professor Peerenboom further writes that interference in political and politically sensitive cases is respectively "generally decisive" and "often decisive."[66]

78.    I am not here endorsing or critiquing Prof. Peerenboom's classification of cases; I cite the above to show simply that even Prof. Peerenboom, who has appeared as an expert in cases arguing in favor of dismissal to China on forum non conveniences grounds (including Zhang Guimei v. General Electric, discussed above at paras. 63-69), agrees that in many different types of case, *including ones that he would define as routine*, intervention is possible.  If Party or government officials choose to interest themselves in the outcome of this case, they possess all the tools they need to exercise influence over the court.   This much is not in controversy.  The only real question, then, is whether this is the type of case in which there is more than a negligible risk of such intervention, and whether Plaintiff should be required simply to hope that the risk does not materialize.

79.    There are many reasons for believing that Party and government officials will indeed interest themselves in this case.  First of all, the involvement of foreign parties automatically raises the profile of any case.  Second, the allegations in this case are politically sensitive and involve conduct by the Chinese government.  It is inconceivable that the government would allow mere low-level judges—and judges have a much lower political and social status in China than in the United States—to decide a matter of such national importance on their own.

80.    For example, among Plaintiff's allegations is the claim that the central government of China knowingly participated in the pirating of Plaintiff's software.  Given the many commitments of the Chinese government to protect intellectual property rights, it is inconceivable to me that the central government could allow a Chinese court to find these allegations to be true.  I cannot think of a *single instance* in which a court in the People's Republic of China has made a finding that would come

---

[66]  Fu and Peerenboom, *supra* note 62, at 44.

29

DECLARATION OF DONALD C. CLARKE

even close to causing such embarrassment to the central government on such an important issue.

81.    The deLisle Declaration cites many cases in which "the government" has lost suits for infringement of intellectual property.[67] This broad-brush term obscures the fact that all the cases cited involve *local governments*. Prof. deLisle's extensive research does not appear to have unearthed a single case involving the central government. I cannot agree with the suggestion of the deLisle Declaration that if courts are capable of finding the Changzhou City Wujin District Education Bureau liable for copyright infringement, they are therefore equally capable of finding the central government of the People's Republic of China liable for pirating software in the course of a project to monitor and censor internet usage in China. It is unrealistic to ignore both the nature of the claims at issue here and the status of the state defendant and its proxies.

*Corruption in the Court System*

82.    Corruption is a serious problem in the Chinese court system.[68] It is regularly mentioned as a problem in the annual reports delivered by the President of the Supreme People's Court to the National People's Congress, China's formal legislative body. Prof. Peerenboom has stated elsewhere:

---

[67] Regrettably, China does not have a well developed system of case reporting and citation. The deLisle Declaration's citations for these cases are not in a form that allows the reader to find the cases and verify that Prof. deLisle's analysis of them is correct. Since Prof. deLisle has not provided the information necessary to confirm the accuracy of his understanding of the cases, I do not believe significant weight should be attached to them.

[68] *See* Peerenboom, *supra* note 52, at 295 (corruption "is becoming more serious and widespread"); *see also* CECC ANNUAL REPORT 2003, *supra* note 9, at 63 ("Chinese courts continue to be plagued by widespread corruption."); TAN SHIGUI, SIFA FUBAI FANGZHI LUN (On The Prevention Of Judicial Corruption) (2003), at 53. For a recent scholarly study, see Ting Gong, *Dependent Judiciary and Unaccountable Judges: Judicial Corruption in Contemporary China*, THE CHINA REVIEW, Vol. 4, No. 2 (Fall 2004), at 33.

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

30

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

Rampant corruption within the courts has badly tarnished the image and stature of the judiciary. Stories abound of various forms of judicial malpractice such as judges demanding bribes, meeting *ex parte* with parties in restaurants or Karaoke bars, and demanding the parties fund lavish "investigation trips."[69]

83.    Nor is such corruption confined to lower levels.   Recently, Huang Songyou, a very senior judge (vice president) at the Supreme People's Court, was sentenced to life imprisonment for taking bribes while on that court and for embezzling funds while serving as a judge on a lower court.[70]

84.    The President of the Higher-Level People's Court of Yunnan Province, the most senior and powerful official in a provincial-level court immediately below the Supreme People's Court, was found to have engaged in the smuggling of automobiles and to have assisted a lower court in hiding almost US$1 million in litigation fees.[71]

85.    Or consider this report about Mai Chongkai, who from 1989 to 1998 was the President of the Higher-Level People's Court of Guangdong Province and, as deputy secretary of the Guangdong Province Communist Party's Political-Legal Committee, the second-highest ranking provincial Party official in all matters concerning courts, prosecutors, and police:

He accepted over 1.7 million [*yuan*] in bribes by abusing his authority of office and, in addition, accepted over 10 million *yuan* in bribes together with his son.  He lived a depraved life and kept numerous mistresses.[72]

---

[69]    *See* Peerenboom, *supra* note 52, at 295.

[70]    *See China jails senior judge for life over corruption*, BBC NEWS, Jan. 19, 2010, *available at* http://news.bbc.co.uk/2/hi/asia-pacific/8467064.stm.

[71]    *See* Tan Shigui, *supra* note 68, at 47. The same author reports a number of other cases involving senior judges.

[72]    *Hong Kong Hsin Pao Article Cites Egregious Cases of Judicial Corruption in PRC*, Hong Kong Xin Pao (Hong Kong Economic Journal) (in Chinese), March 6, 2003,  available  at  World  News  Connection,  http://www.wnc.gov.    Note  that

31

DECLARATION OF DONALD C. CLARKE

86.    A former President of yet another provincial-level court, the Higher-Level People's Court of Liaoning Province, was reported in 2002 to have been stripped of his Party membership and dismissed from public positions for taking bribes.[73]

87.    Because China's enforcement of its own anti-corruption laws is lax, it is reasonable to assume that many more judges commit acts of corruption than are caught and punished.[74]   China has only 31 provincial-level courts, and thus only 31 provincial court presidents at any one time.   That three such senior judges—the top officials at courts immediately below the Supreme People's Court, with significant power to influence how cases heard in their courts should be decided—should have been caught and punished within the space of a few years is sobering testimony to the pervasiveness of the problem.[75]

---

Guangdong is not a poor and remote province like Yunnan.   It is one of China's wealthiest provinces, whose per capita GDP in 2004, at 19,707 *yuan*, was almost twice the national figure.   The current exchange rate is about eight *yuan* to one U.S. dollar.

[73] *Highlights of Major Beijing-Based Newspapers*,   Xinhua General News Service, Sept. 17, 2002, available in LEXIS, NEWS library, Xinhua file.   Like Guangdong, Liaoning is also a wealthy province with a per capita GDP in 2004 of 16, 297 *yuan*, compared with the national figure of 10,561 *yuan*.

[74] *See generally* Laetitia Tjoa et al., *Complying with PRC Antibribery Laws*, CHINA BUSINESS REVIEW, No. 2 (March-April 2005), at 34 ("the PRC antibribery law has been neither strictly nor consistently enforced"); Patrick M. Norton, *The Foreign Corrupt Practices Act: A Minefield for US Companies in China*, CHINA LAW & PRACTICE, No. 9 (Nov. 2004), at 15 (available on Westlaw at 2004 WLNR 14891069) (stating that "China's enforcement of its laws is highly capricious", that "many of China's anti-corruption laws are simply not enforced in practice", and that the actual incidence of corruption is likely much greater than the number of reported offenses suggests).

[75] On corruption Shanghai courts, see, Ning Nan, *A Real Estate Case Involving "Judicial Corruption" Appears in Shanghai; Everyone Knows About It, but Whoever Sees It Hides* (in Chinese), Feb. 2, 2005, *available at* http://nx.people.com.cn/GB/channel13/61/200502/03/18628.html.

32

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

*Educational Level of Judges and General Competence*

88.    China's judges are on the whole poorly educated.  Article 9 of the Law on Judicial Officers (also translated as the Judges Law) states that judges are required to have, among other things, a four-year undergraduate degree in law *or* an undergraduate degree in *any* subject plus "specialized knowledge of law," a requirement that is flexibly interpreted.  Even this requirement can be waived with the approval of the Supreme People's Court in areas where finding people with the requisite level of education is difficult.[76]  The deLisle Declaration contains statistics about undergraduate degrees, but does not specify in what field these degrees were obtained.

89.    Thus, it is not the case even for new judges that an undergraduate degree in law is required. Still less is it the case for judges already in post in 1995, when the new requirements came into effect.   (Prior to 1995, there were *no* educational qualifications that judges were required to have.) They are required merely to undergo unspecified training. In short, there are many judges (as well as lawyers) who do not have undergraduate degrees in law.[77]

90.    Actual reliable statistics are hard to come by, particularly statistics for four-year undergraduate degrees in law as opposed to undergraduate degrees in anything.  It seems unlikely to me that such numbers are not known; it seems more likely that they are not made public because they are embarrassingly low.  Zhang Weili states that out of 250,000 court cadres[78] in 1997, 5.6%—approximately

[76]  Article 6 of the Lawyers Law states a similar principle for lawyers.

[77]  The legal knowledge even of those who are recorded as having an undergraduate degree in law is still unknowable, since degrees in law are awarded to those who major not only in law, but also in international relations, political science, public administration, and sociology.  *See* Zou Keyuan, *Professionalizing Legal Education in the People's Republic of China*, 7 SINGAPORE J. OF INT'L & COMP. L. 159, 181 (2003).

[78]  The term "court cadres" includes all persons with the rank of government official working in the court system.  The number of actual judges is probably about

DECLARATION OF DONALD C. CLARKE

04444\00001\178991.1

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

14,000—had bachelor's degrees in any subject, and only 0.25%, or 625, had post-graduate degrees in any subject.  Tan Shigui reports that as of the end of 2001, of 280,000 court cadres, 27% had a bachelor's degree in *any* subject, and of those 20% had a degree in law.  (It is unfortunately impossible to tell whether he means 20% of the 27%, or 20% of the original 280,000, but in any case the number cannot be over 20% of the total).[79]  Li Xiaobin, in a study of nine basic-level courts in one city, found that only 3% of the judges had proper LL.B. degrees; a full 45% did not have even the equivalent of a junior college-level education in any field.[80]  These numbers are roughly in line with the estimate of a group of law professors in March 2001 that fewer than 10% of judges had proper LL.B. degrees,[81] and with the statement of another author that the number of judges with law degrees is "extremely low."[82]  As of early 2003, it appears that the number of judges with a college degree in *any* subject is about 40% of the total.[83]

*Problems with Obtaining Evidence and Compelling Testimony*

91.   *There is no "discovery" in the Chinese legal system, as that term is understood in the United States legal system.*  In China, the courts, not the parties, are

---

100,000 less.  *See* Donald Clarke, *Empirical Research into the Chinese Judicial System*, *in* BEYOND COMMON KNOWLEDGE: EMPIRICAL APPROACHES TO THE RULE OF LAW 164, 173-175 (Erik Jensen & Thomas Heller eds., 2003). It is not clear whether judges are likely to be more or less educated than court cadres as a whole.

[79]  *See* TAN SHIGUI, SIFA FUBAI FANGZHI LUN (On The Prevention Of Judicial Corruption) (2003), at 53, 57.

[80]  *See* Li Xiaobin, *How Can Adjudication Efficiency Be Greatly Raised?* (in Chinese), FAXUE (Jurisprudence), No. 10, 1998, at 52, 52.

[81]  Interview by declarant with members of Beijing University Faculty of Law (March 2001).

[82]   Zhu Wei, *On Judicial Independence* (in Chinese), DANGDAI FAXUE (Modern Jurisprudence), No. 6, 2000, at 5, 7.

[83]  *See* CECC ANNUAL REPORT 2003, *supra* note 9, at 63.

34

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

responsible for discovery, and the parties may not take or request discovery except as specifically allowed by the court. *The parties do not have the right to demand discovery on other parties, much less third parties.* The deLisle Declaration states at ¶ 35 that under Chinese law, parties have the right to "collect and provide evidence," to "consult material relevant to their case" and to "copy relevant material and legal documents." This is not, however, what we would recognize as discovery in the United States. These rights do not permit a party to require another party, still less a third party, to provide evidence. Only a court has such power.

92.   Even evidence that is collected and provided has no guarantee of being considered by the Chinese courts; a court may deny requests of parties to consider even the most central evidence relevant to their case, particularly in cases involving politically sensitive issues. For example, Zhao Yan, a researcher for the *New York Times* Beijing bureau, was accused of disclosing state secrets to the bureau chief, Joseph Kahn, in connection with an article Kahn had written that displeased the government. At his trial, his attorneys wished to introduce Kahn's testimony, and Kahn was willing to testify. But the court refused to allow him to do so.[84] That this is a criminal case does not detract from the lesson: whether witnesses are required or allowed to testify is a matter completely within the province of the court; it is not for the attorneys to decide.

93.   The deLisle Declaration makes several assertions respecting procedures for the collection of evidence (¶35), citing applicable provisions of Chinese law. It does not, however, address the issue of whether these procedures are actually implemented in practice. They are not.

94.   Many Chinese writers on the subject of evidence complain precisely that witnesses cannot in practice be forced to testify in court or out of it. Whatever the

---

[84]   *See* David Lague, *China Trial of Times Researcher Ends Without Verdict*, N.Y. Times, June 17, 2006, *available at* http://www.nytimes.com/2006/06/17/world/asia/17zhao.html.

35

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

Civil Procedure Law may declare to be the obligations of witnesses, that obligation is not a real one in the sense of being backed by sanctions. Even as a matter of law, let alone reality, Chinese courts lack the authority in suits of this nature either to compel attendance by a witness or to fine a witness who refuses to attend, a failing noted and criticized in an official report from 1993[85] as well as more recently.[86]

95.    Actual reality seems, from all the available evidence, to reflect the lack of sanctions in the law.  Chinese courts face severe difficulties in inducing witnesses to testify.[87]  A litany of sources attests to this:

> Statistics from courts all over the country show that in many places, 95 to 98 percent of witnesses who received a summons from the court instructing them to appear did not

---

[85] *See Report on the Situation Regarding Implementation of the "Civil Procedure Law of the People's Republic of China"* (in Chinese), in ZHONGHUA RENMIN GONGHEGUO QUANGUO RENMIN DAIBIAO DAHUI CHANGWU WEIYUANHUI GONGBAO (PRC National People's Congress Standing Committee Gazette), No. 1, 1993, at 90, 95 [hereinafter *Implementation Report*].

[86] *See* Bi Yuqian, *An Exploration of the Problem of Witnesses Appearing in Court to Give Evidence* (in Chinese), *in* 1 ZHONGGUO SIFA SHENPAN LUNTAN (China Judicial Adjudication Forum) 144, 168 (Bi Yuqian ed., 2001); Fan Chongyi & Chen Yongsheng, *Research Into the Cross-Examination System – Mainly in Criminal Procedure But Also in Civil Litigation* (in Chinese), in ZHONGGUO SIFA SHENPAN LUNTAN (China Judicial Adjudication Forum) 118, 142 (Bi Yuqian ed., 2001); Zou Guohua, *Some Thoughts About the Establishment of a Modern Witness System* (in Chinese), *in* 3 ZHENGJU XUE LUNTAN (Forum for Studies in Evidence) 374, 376 (He Jiahong ed., 2001); Mo Zhang & Paul J. Zwier, *Burden of Proof: Developments in Modern Chinese Evidence Rules*, 10 TULSA J. COMP. & INT'L L. 419, 468-469 (2003).

[87] Numerous sources attest to this.  According to He Jiahong, a well-known professor of law at China People's (Renmin) University, witnesses will say something like, "I know the law says that those who know the circumstances of the case have a duty to testify, but I'm just not going to.  What can you do to me?  Can you eat me?  Can you make the court sentence me?"  Long Zongzhi & He Jiahong, *The Way Out of the Zone of Errors in Witness Testimony* (in Chinese), in 2 ZHENGJU XUE LUNTAN (Forum for Studies in Evidence) 159, 161 (He Jiahong ed., 2001).

36

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

appear in court.[88]

[I]t is quite common for witnesses to refuse to testify [whether in court or by an out-of-court statement], and especially to refuse to testify in court.[89]

It is no exaggeration to say that witnesses not appearing in court to testify is the most outstanding problem in judicial practice today.[90]

96.    It is also important to note that Chinese law does not provide parties the opportunity to confront opposing witnesses as of right.[91]  The testimony of witnesses who do not appear in court and cannot be cross-examined need not be excluded, *even when their failure to appear is not excused*.

97.    As noted above (¶92), parties do not have the right to present their own witnesses, much less to compel the testimony of adverse witnesses or third-party witnesses.  Whether such testimony will be allowed is entirely at the discretion of the court.  It is not available as a matter of right.

98.    The same is true of the presentation and consideration of documents at trial.  No right to present documents at trial exists as a matter of right under Chinese law.  Which documents will be considered is entirely at the discretion of the court.  As with witness testimony, I would expect the discretion to be influenced by extra-judicial factors in sensitive cases.

---

[88]  Bi Yuqian, *supra* note 86, at 144.

[89]  Zou Guohua, *supra* note 86, at 376.

[90]  Long Zongzhi & He Jiahong, *The Way Out of the Zone of Errors in Witness Testimony* (in Chinese), in 2 ZHENGJU XUE LUNTAN (Forum for Studies in Evidence) 159, 164.

[91]  *See* Civil Procedure Law, art. 70.  This provision allows a court to take a written statement in lieu of a witness's appearance in court when the witness would have "genuine difficulty" in appearing.  The key, of course, is how loosely Chinese courts interpret this phrase.  As I show here, they interpret it very broadly.  At a recent criminal trial in China, for example, the court excused the personal appearance of a witness for the prosecution and accepted a written statement instead even though the witness was in custody and could easily have been brought to the courtroom.

37

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

99.     Not only does the law allow such non-cross-examined testimony, but the evidence is clear that in practice it is commonly allowed as well.  In fact, Chinese courts can and do at times decide cases on the basis of documentary evidence alone.  As noted above, Chinese courts face severe difficulties in inducing witnesses to testify in court and subject themselves to cross-examination.  According to the materials I have canvassed, the great majority of witnesses who do produce testimony do not produce it in court, but instead submit written statements that, not being live witnesses, cannot be cross-examined.[92]

100.    One study found that 85% of witness testimony was simply read aloud in court and not subject to cross-examination.[93]

101.    Moreover, even when the court does not excuse the witness's non-appearance, the consequence of failing to appear is *not* inadmissibility of the testimony; a written statement not subject to cross-examination will still be accepted. The only difference is that it may not be relied on as the *sole* basis for a finding of fact.[94]  Thus, a court may make a finding of fact on the basis of a written statement of a single witness not subject to cross-examination if that witness's absence from court is excused; if the witness's absence is not excused, it may make a finding of fact on the basis of *two* such statements .

102.    Indeed, so undemanding are Chinese courts of witnesses that the same study found that of 243 cases of absent witness testimony being read aloud in court, in 58 cases *the name of the witness was not even revealed*.[95]  As Chinese scholars have

---

[92]    *See* Jing Hanchao, Sifa Shijian Zhong De Lilun Tansuo (Theoretical Explorations in Judicial Practice) 104 (2003); Zou Guohua, *supra* note 86, at 374-375.

[93]    *See* Bi Yuqian, *supra* note 86, at 144.

[94]    *See* Supreme People's Court, Several Rules Regarding Evidence in Civil Litigation (in Chinese), issued Dec. 21, 2001, Art. 69, *cited in* Peerenboom Declaration, ¶ 33.

[95]    *See* Bi Yuqian, *supra* note 86,

38

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

noted, this lack of opportunity to cross-examine severely compromises the reliability of the evidence.[96]

*Local Counsel Could Not Zealously Represent Plaintiffs*

103. If this case is tried in China, Plaintiff would be required to retain Chinese lawyers to represent it. It would be difficult for Chinese attorneys to represent Plaintiff zealously in such a politically charged case, if indeed they dared to take the case at all.

104. In the words of a recent Human Rights Watch report on the Chinese legal profession:

[L]awyers often face violence, intimidation, threats, surveillance, harassment, arbitrary detention, prosecution, and suspension or disbarment from practicing law for pursuing their profession. This is particularly true in politically sensitive cases.[97]

105. Prof. Fu Hualing of the University of Hong Kong Faculty of Law describes the predicament of lawyers in virtually identical language:

Lawyers are growing in number and importance in China's social and economic life, and in the process, they are often harassed, intimidated and even prosecuted for doing their work.[98]

106. Professor Peerenboom writes the following about lawyers who take cases considered political by the authorities:

Lawyers may be harassed, and in some cases arrested in trumped up charges. Some lawyers have also been beaten by thugs, in some cases

---

[96] *See* Jing Hanchao, *supra* note 92, at 105.

[97] *See* HUMAN RIGHTS WATCH, WALKING ON THIN ICE: CONTROL, INTIMIDATION AND HARASSMENT OF LAWYERS IN CHINA 3 (April 2008) (hereinafter WALKING ON THIN ICE).

[98] Fu Hualing, *When Lawyers Are Prosecuted ... : The Struggle of a Profession in Transition* 3 (2007), *available at* http://ssrn.com/abstract=956500.

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

linked to the authorities, or by police or members of the security bureau.[99]

107.   As I shall show below, the institutional tools exist for political authorities to punish lawyers for taking disfavored cases.  Recent history demonstrates that they are willing to use those tools.  The only real issue is that of how likely it is that those tools will be used in this particular case.

108.  Despite recent reforms, the Chinese lawyer system remains very different from that of the United States and other Western countries. These reforms have seen a slight loosening of the tight control that existed at least well into the 1990s.  Yet the national Ministry of Justice ("MOJ") and its local counterparts (justice bureaux or justice departments) maintain a great deal of influence over the work of lawyers and law firms.[100]

109. The MOJ and its local counterparts exercise control over individual lawyers through control, among other things, over the license to practice.[101]  A lawyer may lose his or her license to practice on grounds wholly unrelated to criminality, morals, competence, or professional misconduct, such as on the grounds of expulsion from the Communist Party.[102]  Lawyers have been punished by disbarment for representing clients disfavored by the government.[103]  Bar associations can provide no protection, for the local justice bureaux appoint their leadership and control them.[104]

---

[99]  Fu and Peerenboom, *supra* note 62, at 11.

[100]  *See* Jing Hanchao, *supra* note 92, at 104 (2003); Zou Guohua, *supra* note 86, at 374-375.

[101]  A regulation spelling this out is the Rules of the PRC Ministry of Justice on the Punishment of Lawyers (in Chinese), Oct. 22, 1992, *available at* http://www.law-lib.com/law/law_view.asp?id=9075 [hereinafter Rules on Punishment of Lawyers].

[102]  *See id.*, Art. 10.

[103]  See, for example, the story of Zheng Enchong recounted at ¶ 121 *infra*.

[104]  *See, e.g.,* Yang Kezhong, *Some Issues in the Strengthening of the Administration Function over Lawyers' Associations* (in Chinese), Faxue

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

40

DECLARATION OF DONALD C. CLARKE

110.  Clients do not enjoy with Chinese lawyers anything like the privileged and legally protected relationship that they have with lawyers in the United States and other jurisdictions. In 1989, the Minister of Justice himself said:

> China should continue to require that lawyers always consider their socialist orientation. . . .  [W]e are absolutely against the idea that lawyers in China should become individual professionals as is the case in capitalist countries.[105]

111.  Although the Chinese lawyer's duty to the state as opposed to his client is less in the civil than in the criminal field, it is a question of degree, not of fundamental difference.  It is implausible to suppose that the mechanisms and incentives that allow for government interference with lawyers in criminal cases suddenly cease to exist when a civil case involving a huge claim against an influential local company such as CEA is involved.

112.  Finally, professional ethics are a serious problem. According to Prof. Peerenboom,

> Chinese lawyers involved in litigation frequently engage in unethical behavior (often because there is little alternative if they are to

---

(Jurisprudence), No. 7, 1994, at 46, 46 ("[L]awyers associations are [state] administrative organs in disguise").

[105]  CHINA DAILY, Aug. 29, 1989, at 3, col. 1, *cited in* Timothy A. Gelatt, *Lawyers In China: The Past Decade And Beyond*, 23 N.Y.U. J. INT'L L. & POL. 751, 793-94 (1991).  The hostility of the state to civil society institutions genuinely independent of government has not, in my opinion, declined appreciably since the time this statement was made.  In 2003, for example, the central Ministry of Civil Affairs issued a list of proscribed organizations that included unauthorized fishing clubs and associations for the study of antique furniture and paper cutting.  *See* Zhonghua Renmin Gongheguo Minzheng Bu Gonggao (Bulletin of the People's Republic of Civil Affairs), No. 41, June 6, 2003, *available at* http://web.archive.org/web/20031218021718/http://www.mca.gov.cn/news/shtuan41.html.

41

DECLARATION OF DONALD C. CLARKE

compete with other lawyers and serve their clients' interests).[106]

113.   This observation merely serves to underscore the observations of many others inside and outside China respecting the degree of corruption in the Chinese judicial system—that a party that refuses to engage in corrupt and unethical[107] behavior will often find itself at a disadvantage in litigation.

114.   In addition to individual lawyers, law firms in China are under the jurisdiction of MOJ and the local justice bureaux.  Law firms may be established only with their approval, and they have the power to suspend or close down law firms.[108] This power is more than theoretical; it has been used recently in more than one high-profile case against lawyers and firms who, in the view of the authorities, went too far.[109]

115.   Local justice bureaux sometimes require law firms to report and receive approval for the undertaking of cases deemed sensitive, a recent example being any case involving Falun Gong adherents.  In some cases representation of certain clients may simply be prohibited.  Such requirements typically are secret (thus presenting due process problems of their own), but examples occasionally come to light.

116.   In April of 2006, for example, the government of the city of Shenyang in Liaoning Province issued a regulation requiring lawyers to report to, and seek

---

[106]   Peerenboom, *supra* note 5, at 27.

[107]   I do not wish to misrepresent Prof. Peerenboom's views:  he does not unambiguously include *corrupt* behavior, such as bribing judges, within the scope of the unethical acts that lawyers are in effect forced to commit, and he may not have intended to include it.  I believe that the facts and reasoning behind his statement make it plausible to include corrupt acts within the scope of unethical acts.

[108]   *See* Rules on Punishment of Lawyers, *supra* note 101.

[109]   The Yitong Law Firm in Beijing, for example, was recently closed down for six months on what were widely considered to be specious charges; the firm was "known for its activist approach to human rights issues and official corruption." Martha Neil, *China Closes Yitong Law Firm Known for Legal Activism*, ABA JOURNAL, March 19, 2009, *available at* http://tinyurl.com/pq7yxl.

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

42

DECLARATION OF DONALD C. CLARKE

instructions from, the relevant municipal authorities before undertaking "important," "difficult," or "sensitive" cases.[110]  The intention of the regulation is clear: to deny or hobble legal representation to certain plaintiffs or defendants deemed troublesome by the local government even where their cases are legally meritorious.

117.   In July of 2006, an explosion at a chemical factory in Jiangsu killed at least 12 people and required the evacuation of more than 7000 people from the surrounding area.[111]  A local edict prohibited lawyers from getting involved in the case.[112]

118.   The May 2008 earthquake in Wenchuan, Sichuan Province, caused the collapse of many school buildings and the deaths of the children inside.  Parents' demands for an investigation into possible shoddy corruption have been rejected, as have their attempts to take their cases to court.  Lawyers have been instructed by authorities not to take these cases:[113]

> Amnesty International was told by parents that lawyers from Sichuan
> province dare not take up cases of alleged substandard construction that
> led to the collapse of many school buildings and were warned by the

---

[110]   *See* Shenyang Shi lüshi chengban zhongda yinan min'gan anjian qingshi baogao de ruogan yijian (Several Opinions on Reporting and Requesting Instructions When Shenyang Lawyers Handle Important, Difficult, or Sensitive Cases), April 2006, *cited in Shenyang lüshi chengban min'gan anjian xu qingshi* (Shenyang Lawyers Must Seek Instructions When Handling Sensitive Cases), *available at* http://www.legalinfo.gov.cn/moj/lsgzgzzds/2006-04/20/content_303794.htm (Chinese Ministry of Justice official web site).

[111]   *See E. China Chemical Blast Kills 12*, CHINA DAILY, July 28, 2006.

[112]   *See "Lüshi bu de jieru" dui shei you li?* (To Whose Advantage Is It that "Lawyers Are Not Permitted to Get Involved"?), Aug. 24, 2006, *available at* http://news.sina.com.cn/o/2006-08-24/02269830142s.shtml.

[113]   The following quotations are from AMNESTY INTERNATIONAL, JUSTICE DENIED: HARASSMENT OF SICHUAN EARTHQUAKE SURVIVORS AND ACTIVISTS 17-18 (2008).  The report contains a great deal of additional information on governmental manipulation of the legal system in cases it deems sensitive.

43

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

authorities to stay out of these cases.  . . . .

[A parent] has also contacted several lawyers from Sichuan province, but all of them refused to take up these cases. One of them told him that he would have not have a way to make a living in the future if he took up cases related to the earthquake.  . . . .

The lawyers in Beijing who had been approached by some survivors told Amnesty International that soon after these parents contacted them, the Beijing Municipal Bureau of Justice warned the law firms in which these lawyers are employed not to participate in these cases and ordered guarantees from the law firms that they would not take part in these cases.

119.   In the aftermath of the melamine-tainted milk scandal of 2008, in which hundreds of thousands of infants were poisoned, at least six fatally, authorities warned lawyers not to take cases from prospective plaintiffs.[114]   Only when the political decision was later made to allow the court system a role in handling compensation issues did it become acceptable for lawyers to get involved.

120.   Sometimes lawyers do take disfavored cases, but suffer serious consequences, with obvious lessons for other lawyers the next time they consider whether or not to take a disfavored case.

121.   Zheng Enchong, a lawyer in Shanghai, had his license revoked in 2001 after he advised more than 500 families displaced by Shanghai's urban redevelopment projects on their rights to fair compensation from the authorities.  He was later arrested and convicted in the summer of 2003 on a charge of revealing state secrets to entities outside of China.  As far as is known, the "secrets" in question involved information about a labor protest in Shanghai that was broken up by police.[115]

---

[114]   *See* Vivian Wu, *Top Court Official's Vow Gives Hope to Families of Milk Scandal Victims*, SOUTH CHINA MORNING POST, March 4, 2009, at 7.

[115]   *See* Amnesty International, *UK-China Visit: Economic Progress Must Not*

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

DECLARATION OF DONALD C. CLARKE

122.   A lawyer who defended Mr. Zheng, Guo Guoting, was banned from practising law for a year for acting and speaking in a way judged by city officials to have "violated our country's constitution."[116]  Guo has stated that authorities told him on several occasions to abandon his case, explaining, "It's not a legal matter, it's a political matter."[117]  Guo was later placed under house arrest and eventually forced into exile; he was granted political asylum in Canada in May 2005.[118]

123.   Li Baiguang, a senior advisor at Beijing Anping City Law Firm, was detained by authorities in Fuan City, Fujian Province in 2004, after filing a lawsuit on behalf of local farmers who had been forcibly evicted from their land. Upon his release, Li was warned not to further "disrespect" Fuan City officials.[119]

124.   Zhu Jiuhu, a Beijing human rights lawyer, was detained in 2005 for "disturbing public order" while representing private investors in Shaanxi Province oil wells who claimed the government had illegally seized their assets. Zhu was freed later that year, however as a condition of his release, he is no longer allowed to practice law.[120]  Another lawyer involved in the case, Gao Zhisheng, had his firm's

*Blind      UK      to      Human      Rights      Failings*,      *available      at* http://www.amnesty.org.uk/news_details.asp?newsID=16549.

[116]  *See* Mure Dickie, *Court Move Undermines Commitment to Rule of Law in China*, FINANCIAL TIMES, June 1, 2005.

[117]  *See* Howard W. French, *A Mild Shanghai Lawyer and His Accidental Crusade*, NEW YORK TIMES, Sept. 18, 2004, at A4.

[118]  *See A Rights Defense Lawyer Takes the Long View: An Interview with Mo Shaoping*, CHINA RIGHTS FORUM, No. 2, 2007, at 82 n.9, *available at* http://hrichina.org/public/PDFs/CRF.2.2007/CRF-2007-2_Lawyer.pdf

[119]  *See* China Human Rights Lawyers Concern Group, *Li Baiguang*, Feb. 28, 2005, *available at* http://www.chrlcg-hk.org/?cat=7.

[120]  *See* Joseph Kahn, *Legal Gadfly Bites Hard, and Beijing Slaps Him*, NEW YORK TIMES, Dec. 13, 2005.

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

license to practice law suspended for a year on what was, according to press reports, a transparent pretext.[121]

125.   Guo Feixiong (also known as Yang Maodong), a Guangdong human rights lawyer, was arrested in September 2005 after advising residents of Taishi Village, Guangdong Province of their legal rights in their effort to remove a village committee head whom they had accused of embezzlement relating to a land deal. Though released the following February, Guo was again arrested in September 2006.[122]  In July 2007, the Tianhe District Court of Guangdong Province sentenced Guo to five years' imprisonment for illegal business activity in connection with the publication of a book detailing political corruption in Liaoning Province.[123]

126.   Li Heping, a Beijing human rights lawyer who has defended environmental activists, lawyers, and church leaders, was kidnapped, beaten, and told to leave Beijing in late 2007.[124]

127.   Liu Yao, a lawyer in Shenzhen in Guangdong Province who represented a group of peasants accusing the government of having illegally expropriated their land, was sentenced to four years (subsequently reduced to two years) on charges of

---

[121]   *See generally* Howard W. French, *Whose Oil Is It? Property Rights at Issue in China*, NEW YORK TIMES, July 18, 2005; Mure Dickie, *Shaanxi Arrests Highlight Doubts Over the Rule Of Law in China*, FINANCIAL TIMES, Aug. 20, 2005; Mure Dickie, *Beijing Officials Suspend Critical Lawyer's Practice*, FINANCIAL TIMES, Nov. 7, 2005.  Gao's difficulties may not have been due solely to his efforts on behalf of the Shaanxi investors.  He had also publicly criticized the government for its repression of Falungong adherents.

[122]   *See* Radio Free Asia, *China Detains Top Guangdong Rights Lawyer*, Sept. 15, 2006, *available at* http://www. rfa.org /english/news/china_guofeixiong-20060915.html?searchterm=None.

[123]   *See* Human Rights Watch in China, *Rights Defender Guo Feixiong Sentenced to 5 Years in Prison*, Nov. 13, 2007, *available at* http://www.hrichina.org/public/contents/press?revision_id=45551&item _id=45547.

[124]   *See* David Barboza, *Beijing Lawyer Recounts Abduction*, NEW YORK TIMES, Oct. 3, 2007.

46

DECLARATION OF DONALD C. CLARKE

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

inciting peasant protests.  The Chinese legal community generally views these as trumped-up charges; even the quasi-governmental lawyers' associations, as well as 500 lawyers who signed a petition, have protested.[125]

128.   Lawyers Li Chunfu and Zhang Kai were detained and beaten by police when they went to the city of Chongqing to handle a case involving the sudden death of a person being held in a Re-Education Through Labor detention facility.[126]

129.   There are simply too many cases to list here.  According to an article in the official *Beijing Review*—hardly a source of anti-government propaganda—some 500 lawyers were accused of wrongdoing, detained, or otherwise formally punished between 1997 and 2002; of those, 80 percent were eventually found innocent of any wrongdoing.[127]  Such statistics can never, of course, be complete, and will not cover all cases; in particular, the *Beijing Review* is unlikely to report cases of lawyers subject to harassment and intimidation because of high-level government disfavor.

130.   In summary, it is highly implausible to suppose that a lawyer in China would be permitted to zealously represent a client bringing a claim that the central government of China was involved in software piracy in the course of a project to monitor and censor internet useage in China.  The charges are simply too sensitive and potentially embarrassing.

*Significance of Previous U.S. Litigation*

---

[125]  *See* Tom Mitchell, *Chinese Court Upholds Lawyer's Conviction*, FINANCIAL TIMES, Dec. 23, 2008.

[126]  *See* China Human Rights Lawyers Concern Group, *Beijing Lawyers Li Chunfu and Zhang Kai Beaten for Representing Re-Education Through Labour Camp Death Case*, May 14, 2009, available at http://www.chrlcg-hk.org/?p=419 (press release).

[127]  The article is cited in a report from the Congressional-Executive China Commission entitled *Beijing Review Examines Key Issues in China's Legal Profession, Among Them the Obstacles Faced By Defense Lawyers*, Jan. 18, 2005, *available at* http://www.cecc.gov/pages/virtualAcad/index.phpd?showsingle=5450#.

47

DECLARATION OF DONALD C. CLARKE

131.   The deLisle Declaration cites several cases in footnote 58 in support of the proposition that "U.S. courts repeatedly have found [China and other countries with similar World Bank Rule-of-Law rankings] to be adequate fora for *forum non conveniens* purposes.   U.S. courts have granted numerous *forum non conveniens* motions dismissing to Chinese courts in recent years."

132.   When examined, however, it turns out that the cases are far less supportive than they are represented to be.   I shall address only a few.

133.   First, in 2002 Irrevocable Trust for Richard C. Hvizdak v. Huntington National Bank, 2008 WL 5110778 (M.D. Fla. 2008), the court did *not* grant the defendants' *forum non conveniens* motion.   It found for the plaintiffs.   For this reason alone, the case cannot be used as support for the proposition for which it is cited.   The court did say, in dictum, that China was an adequate forum.   But the adequacy of China as a forum was not "seriously questioned" by the plaintiffs, and they do not appear to have submitted expert testimony on the issue in opposition to the defendants' expert witness, Prof. Peerenboom.   In short, the issue of China's adequacy as a forum was not seriously argued before the court; the court heard only one side.

134.   The same problem afflicts Feng Zhen Lu v. Air China, 1992 WL 453646 (EDNY 1992).   Defendant in that case submitted the *uncontested* affidavit of a Chinese attorney in support of its motion to dismiss on *forum non conveniens* grounds.   Given the plaintiff's failure to provide expert testimony in support of its position, the court could hardly have done otherwise than to find for the defendant.   Neither *Feng Zhen Lu* nor *Hvizdak*, then, can be taken as representing the considered judgment of U.S. courts that have seriously considered the adequacy of China as a forum in contested proceedings.

135.   In Compania Naviera Joanna S.S., 531 F.Supp.2d 680 (D.S.C. 2007), the opponent to the *forum non conveniens* motion objected only to the particular rules of Chinese law that would apply were the case to be dismissed to China.   The issues of

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

48

DECLARATION OF DONALD C. CLARKE

extra-judicial influences on Chinese courts and other serious systemic problems were never addressed.

136.   In S. Megga Telecommunications v. Lucent Technologies, 1997 WL 86413 (D. Del. 1997), as in *Compania Naviera Joanna*, the party opposing the *forum non conveniens* motion (Lucent) does not appear to have made a serious, or indeed any, argument that China was inadequate as a forum.   It simply asserted that its chosen forum was more convenient.

137.   The opinions in China Gezhouba United Industries v. Robinson Helicopter and Group Dannone v. Kelly Fuli Zhong, cited in footnote 58 of the deLisle Declaration, do not appear to be publicly available.   The same goes for the trial court's order dismissing on *forum non conveniens* grounds in China Tire Holdings v. Goodyear Tire and Rubber, 91 F.Supp.2d 1106 (N.D. Ohio 2000).[128] Given what is revealed by a close examination of the other cited cases, I believe it cannot be taken for granted that these offer support for the proposition that U.S. courts have, in properly contested proceedings, found Chinese courts to offer an adequate forum.

138.   The issue does appear to have been properly joined in Sinochem Int'l v. Malaysia Int'l Shipping, 2004 WL 503541 (E.D. Pa. 2004),[129] and was indeed vigorously disputed in Zhang Guimei v. General Electric, 172 Cal.App.4th 689, 91 Cal.Rptr.3d 178 (2009),.   However, these cases are easily distinguishable from the present case as they involved foreign plaintiffs with minimal or no U.S. connections suing in the U.S., whereas here, CYBERsitter, LLC is a domestic company suing in its home forum.   Moreover, as I have noted above, the assurances of the defendants in

---

[128]   The relevant order is actually part of another case.   *See Orion Tire Corp. v. Goodyear Tire and Rubber Co.,* SA CV 95-221 (U.S Dist. Ct. M.D. Cal.), at 8-10 (August 5, 1996 Order).

[129]   The subsequent history of this case is not relevant to the *forum non conveniens* issue.

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

49

DECLARATION OF DONALD C. CLARKE

04444\00001\178991.1

*Zhang Guimei* that China would be an adequate forum seem now, three years after the plaintiffs were sent to try their luck in China,[130] highly questionable.

*Significance of Academic Studies of Popular Satisfaction with Courts in China*

139.  The deLisle Declaration (para. 43) states that an academic survey found high degrees of satisfaction with courts among ordinary citizen litigants, expressed in their willingness to use the court again.

140.  First, willingness to use the court system again is not an index of satisfaction if all other alternatives are worse.

141.  More importantly, it is a simple matter to cite academic studies that show high degrees of *dis*satisfaction.  Prof. Mary Gallagher of the University of Michigan, for example, finds that actual engagement with the legal system by Chinese citizens results in more negative evaluations of its fairness and effectiveness, a phenomenon she calls "informed disenchantment."[131]  Professors Ethan Michelson and Benjamin Read find "intensely negative assessments of personal encounters" among those with actual experience of the legal system.[132]

142.  This is not the place for an extended discussion of the methodological merits of all of these studies.  I wish only to make the point that what appears undisputed in the deLisle Declaration—the notion that Chinese citizens are highly satisfied with China's court system—is in fact highly disputed among experts in the field both inside and outside of China.

I declare under penalty of perjury under the laws of the United States of America that

---

[130]  The order staying the action in California court was made in 2007.

[131]  *See* Mary Gallagher, *Mobilizing the Law in China: "Informed Disenchantment" and the Development of Legal Consciousness*, 40 L. & Soc'y Rev. 783 (2006).

[132]  *See* Ethan Michelson & Benjamin L. Read, *Public Attitudes Toward Official Justice in Beijing and Rural China*, in Chinese Justice: Civil Dispute Resolution in Contemporary China (M. Woo & M. Gallagher eds., forthcoming 2010).

DECLARATION OF DONALD C. CLARKE

the foregoing is true and correct.  Executed on October 11, 2010, at Washington D.C.

Donald C. Clarke

_____

Donald C. Clarke

GIPSON HOFFMAN & PANCIONE
A PROFESSIONAL CORPORATION

51

DECLARATION OF DONALD C. CLARKE